Poland v. SSA                          CV-99-128-B    12/22/99
                    UNITED STATE DISTRICT COURT
                    FOR THE DISTRICT OF NEW HAMPSHIRE


**Mark A. Poland**

        v.                              Civil No. C-99-128-B

**Kenneth S. Apfel, Commissioner,**
**Social Security Administration**


                       MEMORANDUM AND ORDER


    On October 16, 1996, Mark A. Poland ("Poland") filed an

application for disability insurance benefits under Title II of

the Social Security Act.  After having his application denied,

Poland requested a hearing before an administrative law judge

("ALJ").  Poland was similarly unsuccessful before ALJ Frederick

Harap.  On March 24, 1999, Poland, pursuant to 42 U.S.C. § 405(g)

(1994), filed this action for judicial review of the

Commissioner's final decision denying his application for

benefits.  For the reasons set forth below, I conclude that the

Commissioner's decision to deny Poland benefits was supported by

substantial evidence.  As a result, I affirm the Commissioner's

decision and deny Poland's motion.

                        I.  **FACTS**[1]

_____

        [1]    Unless noted otherwise, the following facts are taken
from the Joint Statement of Material Facts submitted by the

## A. **Procedural History**

Poland was born on December 14, 1955. He has a high school education and formerly worked as a well driller, heavy equipment operator, and construction worker. On October 16, 1996, Poland filed an application for disability insurance benefits under Title II of the Social Security Act. He alleged an inability to work since June 2, 1995, due to a neck and back injury. As of June 8, 1997, Poland had returned to full-time work as a truck driver for the town of Derry, New Hampshire. Accordingly, Poland seeks benefits for the closed period from June 2, 1995 to approximately June 1997.

On November 27, 1996, Poland's application for disability benefits was denied. See Tr. at 80. His request for reconsideration was denied on January 23, 1997. See id. at 83. Poland sought, and was granted, a hearing before an administrative law judge ("ALJ"). See id. at 90. On May 13, 1997, ALJ Frederick Harap held a hearing at which Poland was represented by counsel. Poland was the only witness to testify. The ALJ subsequently issued a decision denying Poland benefits. The Appeals Council granted Poland's appeal and remanded the case to ALJ Harap. The Appeals Council instructed the ALJ, on remand,

parties to this action.

-2-

to 1) evaluate further Poland's subjective complaints of pain; 2) do a function-by-function assessment of Poland's ability to do work-related activities; and 3) call, if necessary, a vocational expert to clarify the effect of the assessed limitations on Poland's occupational base. See id. at 115-17.

On May 13, 1998, ALJ Harap held a second hearing at which Poland, represented by counsel, again testified. Margaret O. Dotter, a vocational expert, also testified. The ALJ concluded that Poland had a residual functional capacity which allowed him to perform a limited range of light and sedentary work. Based upon the vocational expert's testimony, the ALJ concluded that Poland could not perform his past work but that there were jobs in the national economy he was capable of performing. As a result, the ALJ determined that Poland was not disabled and denied his application for disability benefits. The Appeals Council denied Poland's appeal, thereby rending the ALJ's decision the final decision of the Commissioner. See id. at 7. On March 23, 1999, Poland filed this complaint to seek judicial review of the Commissioner's final decision.

B. **Medical Evidence**

In May 1994, Poland was involved in a motor vehicle accident. According to Poland, the vehicle he was driving, while

stopped to make a left hand turn, was struck from behind by another vehicle traveling at a high rate of speed. Poland claims that as a result of the accident he developed progressively worsening stiffness and pain in his neck which radiated to his left arm, as well as back pain and numbness in his legs.

After the accident, Poland went to see Dr. Murray who reportedly treated him with pain killers. Poland was referred for physical therapy. He abandoned this treatment because it did not help him and tended to aggravate his condition. Poland thereafter saw two chiropractors, Dr. Benoit and Dr. Capobianco, before switching to a third chiropractor, Dr. Bell, in March or April of 1996.

On July 31, 1995, Poland underwent a MRI (magnetic resonance imaging) of his lumbar and cervical spine. With respect to the lumbar spine, the radiologist concluded that there was some degenerative change involving L5-S1 and some small bulges at the midline at L5-S1 and to the right of L4-5. See id. at 176. With respect to the cervical spine, the radiologist's most significant finding was the presence of a moderate disc herniation at C6-7 on the left; this herniation effaced a portion of the anterior thecal sac but did not distinctly compress the cervical cord. See id. at 178. The MRI showed some degenerative loss at C2-3,

C3-4, C5-6, and C6-7.  Neither the MRI of the lumbar spine nor
the MRI of the cervical spine showed any fractures or
subluxations,[2] frank spinal stenosis,[3] or significant spur
formation.

On January 8, 1996, Dr. Salerni, a neurologist, reported
that he examined Poland at the request of Dr. Capobianco.  Dr.
Salerni noted Poland's report of chronic radiating neck pain,
aggravated by any activity, as well as difficulties with his
back, especially in the morning.  A physical examination showed
that Poland was alert and able to move about without limitation.
Poland also displayed a normal range of motion of both the
cervical and lumbar regions.  Other findings on examination were
essentially within normal limits.  Based upon his examination and
the radiology reports, Dr. Salerni diagnosed a herniated C6-7
disc and cervical radiculopathy.[4]  Dr. Salerni opined that
Poland's back pain was manageable and, at that time, did not
require any surgical consideration.  See id. at 180.  With

_____

[2] Subluxation is "an incomplete or partial dislocation."
Dorland's Illustrated Medical Dictionary 1596 (28th ed. 1994).

[3] Stenosis is a "narrowing or stricture of a duct or
canal."  Dorland's Illustrated Medical Dictionary 1576 (28th ed.
1994).

[4] Radiculopathy is a "disease of the nerve roots."
Dorland's Illustrated Medical Dictionary 1404 (28th ed. 1994).

respect to Poland's neck and arm pain, Dr. Salerni observed that Poland had been helped by conservative treatment but that he had reached a plateau with this treatment; Dr. Salerni opined that the chance Poland would improve with conservative treatment was quite low. See id. In contrast, surgery – specifically, an anterior cervical discectomy and fusion – offered a better than 90% chance of improvement. Because Poland was a smoker, plating also would be necessary. Dr. Salerni concluded that at that point surgery was elective because Poland did not have any myelopathic findings or paralysis. See id.

Dr. Salerni's June 10, 1996 report also recounted Poland's continued complaints of chronic back and left leg pain, which was aggravated by activity. Dr. Salerni noted that the MRI did not show any "clear cut nerve root compression." See id. at 181. Dr. Salerni stated that Poland's symptoms had continued beyond the period of spontaneous resolution; as a result, he was of the opinion that they would most likely continue indefinitely. According to the doctor, Poland would be limited to light duty work because of his symptoms. His ultimate conclusion was that Poland sustained a whole person impairment of 13%.

In a report dated October 29, 1996, Dr. Bell, Poland's chiropractor, indicated that Poland continued to experience

chronic leg pain and chronic intermittent sciatica.[5]  These
symptoms precluded him from doing any heavy work, sitting for
short periods, or walking for any considerable period.  Dr. Bell
also stated that Poland reported experiencing variable neck pain
which produced numbness and tingling in his arms.  See id. at
184.

---

[5]  Sciatica is "a syndrome characterized by pain radiating
from the back into the buttock and into the lower extremity along
its posterior or lateral aspect, and most commonly caused by
protrusion of a low lumbar intervertebral disk; the term is also
used to refer to pain anywhere along the course of the sciatic
nerve."  Dorland's Illustrated Medical Dictionary 1493 (28th ed.
1994).

On November 8, 1996, Dr. Shea, an orthopedic surgeon, examined Poland at the request of the state Disability Determination Services ("DDS").  Dr. Shea noted Poland's complaints of neck pain radiating to his left arm with numbness, and low back pain radiating down his left leg with numbness in his left foot.  Activity reportedly aggravated these symptoms.  A physical examination showed that Poland was well-nourished, moved with a normal gait, and was able to move about with ease.  There were no positive findings in connection with the physical examination.  Dr. Shea diagnosed a herniated C6-7 disc on the left and degenerative lumbar spondylosis.[6]  Based upon his examination, Dr. Shea indicated that Poland's ability to walk was unlimited, but that his ability to bend, lift, and carry was somewhat limited; his ability to sit and stand also was limited to the extent he would need to change position frequently.

Medical consultants for the state DDS reviewed the medical evidence of record and rendered an assessment of Poland's physical capabilities.  Based upon Poland's medical history, reported symptoms, the clinical and diagnostic findings, and the

---

[6]  Lumbar spondylosis is a "degenerative joint disease affecting the lumbar vertebrae and intervertebral disks, causing pain and stiffness, sometimes with sciatic radiation due to nerve root pressure by associated protruding disks or osteophytes." Dorland's Illustrated Medical Dictionary 1564 (28th ed. 1994).

proffered reports and opinions of his treating medical sources, the DDS doctor opined that Poland retained a functional capacity for physical activity at the light extertional level. According to this assessment, Poland could stand and/or walk, with normal breaks, for about 6 hours in an 8 hour workday and sit, with normal breaks, for about 6 hours in an 8 hour workday. Poland also was capable of occasionally lifting 20 pound and frequently lifting 10 pounds. His ability to push and/or pull was unlimited. The assessment concluded that he could occasionally climb, balance, stoop, kneel, crouch, and crawl. He suffered from no manipulative, visual, communicative, or environmental limitations. See id. at 154-58.

A Chronic Pain RFC Questionnaire completed by Dr. Bell indicated that Poland could walk one city block without resting or experiencing severe pain. Poland was capable of sitting, with normal breaks, for less than 2 hours in an 8 hour workday and standing, with normal breaks, for less than 2 hours in an 8 hour workday. According to Dr. Bell, Poland needed to walk for 10

minutes every 30 minutes. He also would need to be able to shift positions and lie down at unpredictable intervals during the workday. Dr. Bell opined that Poland could frequently lift less than 10 pounds, occasionally lift 10 and 20 pounds, but could never lift 50 pounds. Dr. Bell's assessment also indicated that Poland suffered from significant limitation in reaching or fingering.

In a subsequent assessment dated May 5, 1997, Dr. Bell reached similar conclusions. In particular, Dr. Bell opined that Poland, at most, could stand and/or walk for 1-2 hours in an 8 hour workday and could sit for 2-3 hours in an 8 hour workday. In addition, Dr. Bell opined that Poland could never climb or crouch, could occasionally stoop, kneel, and crawl, and could frequently balance. Poland's impariments also affected his ability to push and pull. Dr. Bell cited medical evidence in support of his opinions.

Dr. Bell prepared a progress report on Poland's condition as of March 17, 1998. In this report, Dr. Bell indicated that Poland complained of intermittent pain in his left shoulder, radiating to his hand, and in the sciatic nerve on his left side.

Dr. Bell observed a gradual improvement in Poland's condition and diagnosed a 5% impairment of the cervical spine and a 5% impairment of the lumbar spine. See id. at 212.

## II. STANDARD OF REVIEW

After a final determination by the Commissioner denying a claimant's application for benefits and upon a timely request by the claimant, I am authorized to: (1) review the pleadings submitted by the parties and the transcript of the administrative record; and (2) enter judgment affirming, modifying, or reversing the Commissioner's decision. See 42 U.S.C. § 405(g) (1994). My review is limited in scope, however, as the Commissioner's factual findings are conclusive if they are supported by substantial evidence. See Irlanda Ortiz v. Secretary of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991)(per curium); 42 U.S.C. § 405(g). The Commissioner is responsible for settling credibility issues, drawing inferences from the record evidence, and resolving conflicting evidence. See Irlanda Ortiz, 955 F.2d at 769. Therefore, I must "'uphold the [ALJ's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the ALJ's] conclusion.'" Id. (quoting Rodriguez v. Secretary of Health and

-11-

Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).

If the ALJ has misapplied the law or has failed to provide a fair hearing, however, deference to the ALJ's decision is not appropriate; remand for further development of the record may be necessary.  See Carroll v. Secretary of Health and Human Servs., 705 F.2d 638, 644 (2d Cir. 1983); see also Slessinger v. Secretary of Health and Human Servs., 835 F.2d 937, 939 (1st Cir. 1987)(per curiam) ("The [ALJ's] conclusions of law are reviewable by this court.").  I apply these standards in reviewing the issues Poland raises on appeal.

### III.  **DISCUSSION**

An ALJ is required to apply a five-step sequential analysis to determine whether a claimant is disabled within the meaning of the Act.[7]  At step four, the ALJ must determine whether the

---

[7]    In applying this five-step sequential analysis, the ALJ is required to determine:
(1)  whether the claimant is presently engaged in substantial gainful activity;
(2)  whether the claimant has a severe impairment that lasted for twelve months or had a severe impairment for a period of twelve months in the past;
(3)  whether the impairment meets or equals a listed impairment;
(4)  whether the impairment prevents or prevented the claimant from performing past relevant work;
(5)  whether the impairment prevents or prevented the claimant from doing any other work.

claimant's impairment prevents him from performing his past work. See 20 C.F.R. § 404.1520(e) (1999). The ALJ must assess both the claimant's residual functional capacity ("RFC"), that is, what the claimant can do despite his impairments, and the claimant's past work experience. See Santiago v. Secretary of Health and Human Servs., 944 F.2d 1, 5 (1st Cir. 1991)(per curiam). At step five, the burden shifts to the Commissioner to show that there "are jobs in the national economy that [the] claimant can perform." Heggarty v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991) (per curiam); see also Keating v. Secretary of Health and Human Servs., 848 F.2d 271, 276 (1st Cir. 1988)(per curiam). The Commissioner must show that the claimant's limitations do not prevent him from engaging in substantial gainful work, but need not show that the claimant could actually find a job. See Keating, 848 F.2d at 276 ("The standard is not employability, but capacity to do the job.").

---

See 20 C.F.R. § 404.1520 (1999).

The Commissioner can meet his burden of proof at step five by posing hypothetical questions to a vocational expert ("VE") and relying upon the VE's testimony. The VE's answer to a hypothetical question is not adequate, however, unless the "inputs into that hypothetical . . . correspond to conclusions that are supported by the outputs from the medical authorities." Arocho v. Secretary of Health and Human Servs., 670 F.2d 374, 375 (1st Cir. 1982); see also Rose v. Shalala, 34 F.3d 13, 19 (1st Cir. 1994) (holding that ALJ cannot rely on VE's testimony when hypothetical omits significant functional limitation).

In the present case, Poland argues that the ALJ's denial of his application for benefits at step five was in error for three reasons. First, Poland alleges that the ALJ improperly evaluated his subjective complaints of pain. Second, Poland argues that the ALJ's RFC determination did not properly reflect his limitations. Third, Poland maintains that the ALJ was not entitled to rely upon the VE's testimony at step five because the hypothetical which the ALJ posed to the VE did not accurately reflect his limitations.

A common theme underlying each of these alleged errors is that the ALJ did not credit the evidence provided by Poland's chiropractor, Dr. Bell. Poland devotes a substantial portion of

his argument to this issue. As a result, I address this issue first.

## A.    <u>The Weight Given to Dr. Bell's Evaluation of Poland</u>

As Poland concedes, the regulations do not consider chiropractors an acceptable medical source; rather, the regulations classify chiropractic evaluations as "information from other sources." <u>See</u> 20 C.F.R. § 404.1513(a),(e) (1999). Because a chiropractor is not an acceptable medical source, a chiropractor cannot render a medical opinion. <u>See</u> <u>Diaz v. Shalala</u>, 59 F.3d 307, 313 (2d Cir. 1995). Even if a chiropractor is a claimant's primary treating source, an ALJ is not required to give controlling weight to a chiropractor's opinion. <u>See</u> <u>id.</u> at 313, 314. Instead, it is left to the ALJ's discretion to determine the appropriate weight to give to a chiropractor's opinion. <u>See</u> <u>id.</u> at 314 (collecting cases which recognize "subordinate status that the opinions of chiropractors occupy under the regulations"); <u>Mandziej v. Chater</u>, 944 F. Supp. 121, 131 n. 10 (D.N.H. 1996) (recognizing ALJ's right to give a chiropractor's opinion less weight).

Although not a medical opinion, a chiropractor's opinion is a valid source of information regarding an impairment's effect upon a claimant's ability to work. As a result, an ALJ cannot discount it without explanation. See Fields v. Shalala, 830 F. Supp. 284, 286 (E.D.N.C. 1993); see also 20 C.F.R. § 1513(e); cf. Nguyen v. Chater, 100 F.3d 1462, 1464 (9th Cir. 1996) ("We hold that the ALJ erred because he neither explicitly rejected the opinion of [the examining psychologist] nor set specific, legitimate reasons for crediting [the non-examining psychologist called by the Commissioner] over [the former]."). The ALJ, however, is entitled to resolve any conflicts between the medical evidence and the chiropractor's opinion. See Lizotte v. Secretary of Health and Human Servs., 654 F.2d 127, 129-30 (1st Cir. 1981); Fields, 830 F. Supp. at 286 (noting that ALJ has prerogative and duty to resolve conflict between doctor's assessment and that of chiropractor, but that ALJ must explicitly indicate the weight accorded to each).

In the present case, the ALJ decided not to credit Dr. Bell's testimony. The ALJ's treatment of Dr. Bell's opinion was proper because the ALJ explained his reasons for rejecting Dr. Bell's assessment of Poland. "Based on the medical evidence of record, the claimant's statements, and his daily functional

-16-

abilities, I am unable to give significant weight to Dr. Bell's opinion concerning the claimant's residual functional capacity." Tr. at 20. In particular, the ALJ concluded that the major difference between his assessment of Poland's residual functional capacity and that of Dr. Bell was with respect to Poland's ability to sit for prolonged periods. The ALJ, pointing to the degree of degeneration at L5-S1, explained that the medical evidence did not support Dr. Bell's assessment that Poland was able to sit only for 2-3 hours in an 8 hour work day. Moreover, the ALJ explained that Poland's assessment of his own ability – on one application he stated he was capable of performing light duty work[8] – did not coincide with Dr. Bell's assessment. See Tr. at 20.

In addition to alleging error in the ALJ's decision not to credit Dr. Bell's evidence, Poland argues that the ALJ erred because he accorded too much weight to the RFC assessment

---

[8] The ALJ's written decision is in error to the extent that the exhibit which he cited in support of this statement actually was Dr. Salerni's evaluation of Mr. Poland. In this evaluation, Dr. Salerni opined that because Mr. Poland's symptoms persisted beyond the period in which it would be expected for them to be resolved spontaneously, they would continue indefinitely. As a result, Mr. Poland would be restricted to "light duty work." See Tr. at 181. In his disability report filed in October 1996, Mr. Poland indicated that Dr. Salerni had informed him that he would be limited to light duty, no lifting over 10-12 pounds. See id. at 145.

-17-

prepared by Drs. Nault and Proctor of the state Disability Determination Services ("DDS"). This argument also must fail. The ALJ is entitled to give evidentiary weight to medical reports prepared by consulting and non-examining physicians. See Gray v. Heckler, 760 F.2d 369, 373 (1st Cir. 1985); Lizotte, 654 F.2d at 130; Rodriguez v. Secretary of Health and Human Servs., 647 F.2d 218, 223-24 (1st Cir. 1981). Moreover, such reports, depending upon the circumstances, can constitute substantial evidence in support of an ALJ's decision. See Berrios Lopez v. Secretary of Health and Human Servs., 951 F.2d 427, 431 (1st Cir. 1991)(per curiam). Assigning significant weight to the non-examining physicians' report is particularly appropriate in the present case because it appears that, at the time the state assessed Poland's functional limitations, the state's doctors had before them all of Poland's medical evidence then available. Moreover, the record discloses no other RFC assessment prepared by an acceptable medical source.[9]

Having addressed these common issues, I now turn to each

---

[9] Dr. Shea's report does not constitute a full RFC assessment. Nonetheless, his evaluation of Poland's ability to perform work related activity is consistent with the state's RFC assessment. In particular, Dr. Shea concluded that Poland's ability to: 1) lift, carry, and bend was somewhat limited; 2) walk was not limited; and 3) sit and stand was limited in that he would need to change positions frequently. See Tr. at 191.

class of error Poland alleges.

**B.    Poland's Subjective Complaints of Pain**

The regulations require that a claimant's symptoms, such as pain, be considered when determining whether a claimant is disabled.[10]  A two-step process is used to evaluate a claimant's subjective complaints of pain.  First, the claimant must suffer from a medically determinable impairment which can reasonably be expected to produce the pain alleged.  See 20 C.F.R. 404. § 1529(b) (1999); see also Da Rosa v. Secretary of Health and Human Servs., 803 F.2d 24, 25 (1st Cir. 1986)(per curiam).  Second, if this showing is made, the ALJ evaluates "the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [the claimant's] symptoms limit [his or her] capacity for work."  20 C.F.R. § 404.1529(c)(1).  At this step, the ALJ considers "all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory

_____

[10]    Pain can constitute either an independent and separate basis for disability or a nonexertional factor to be considered in conjunction with exertional limitations.  Gagnon v. Secretary of Health and Human Servs., 666 F.2d 662, 666 n. 8 (1st Cir. 1981).  Although he does not expressly make this argument, Poland seems to argue that his pain should be treated as a nonexertional limitation.  Under Gagnon, pain complaints presented in this form "need only be found significant enough to prevent the claimant from engaging in the full range of jobs contemplated by the exertional category for which the claimant otherwise qualifies." Id.

findings, and statements from [the claimant], [the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]." Id.

The regulations recognize that symptoms, such as pain, may suggest a more severe impairment "than can be shown by objective medical evidence." Id. § 404.1529(c)(3). Accordingly, the ALJ is directed to consider several factors relevant to a claimant's complaints of pain, including: 1) the claimant's daily activities; 2) the location duration, frequency, and intensity of the claimant's pain; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his pain; 5) treatment, other than medication, the claimant receives or has received for relief of his pain; 6) any measures the claimant uses or has used to relieve pain; and 7) any other factors concerning the claimant's limitations and restrictions due to pain. Id.; Avery v. Secretary of Health and Human Servs., 797 F.2d 19, 29 (1st Cir. 1986). In addition to considering these factors, the ALJ is entitled to observe the claimant, evaluate his demeanor, and consider how the claimant's testimony fits with the rest of the evidence. See Frustaglia v. Secretary of Health and Human Servs., 829 F.2d 192, 195 (1st Cir. 1987)(per curiam)

(holding that ALJ's credibility finding is entitled to deference, especially when it is supported by specific findings).

Consistency is the benchmark against which credibility is measured.[11] That is, to assess the credibility of a claimant's subjective complaints of pain, the ALJ examines whether these complaints are consistent with the objective medical evidence and the other evidence in the record. See 20 C.F.R. § 1529(a). Although objective medical evidence is important, it does not have to corroborate precisely the claimant's complaints of pain; rather, it only needs to be consistent with the claimant's complaints. See Dupuis v. Secretary of Health and Human Servs., 869 F.2d 622, 623 (1st Cir. 1989)(per curiam).

In the present case, the ALJ made the following determination with respect to the credibility of Poland's subjective complaints of pain:

---

[11] "We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence, including your medical history, the medical signs and laboratory findings, and statements by your treating or examining physician or psychologist or other persons about how your symptoms affect you. Your symptoms, including pain, will be determined to diminish your capacity for basic work activities to the extent that your alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4) (emphasis added).

-21-

When examined in light of the criteria set forth above, I find that the claimant's allegation of disabling symptoms is not entirely credible. Mr. Poland's pain symptoms are not constantly disabling. In fact, he elected not to undergo a discectomy recommended by an orthopedic surgeon, presumably because his pain symptoms did not outweigh the risks involved. Although Mr. Poland described restricted activities of daily living, I noted at his hearing that his hands were rough and callused. Mr. Poland acknowledged that he performs a wide range of maintenance on his automobiles, but at a reduced pace. Considering his functional abilities along with the minimal medical evidence and his sporadic record of medical treatment, I find that the claimant does not credibly experience pain symptoms at a level that would further limit his functional capacity from that already assessed. I find that the claimant can perform a limited range of light and sedentary work that is not further limited by his pain symptoms.

Tr. at 19.

Poland identifies several alleged errors in the ALJ's credibility determination. First, he claims that the ALJ impermissibly based his adverse credibility determination upon Poland's decision not to undergo surgery. Second, he asserts that the ALJ did not give proper or sufficient consideration to the Avery factors;[12] in particular, he claims that the ALJ did

---

[12] Poland confuses the two-step analysis used to evaluate subjective complaints of pain. His argument sometimes seems to be that the ALJ misread the medical evidence and concluded that Poland did not suffer from a medically determinable impairment which could reasonably be expected to produce the pain alleged. This is incorrect. The ALJ rejected Poland's subjective complaints of pain at step two, not step one.

The state's RFC assessment of Poland acknowledged that

-22-

not give full consideration to Poland's testimony regarding his daily activities. Third, he argues that it was improper for the ALJ to factor into his credibility determination his observation of callouses on Poland's hands. Like Poland, I am concerned by the limited express and specific findings provided by the ALJ to support his credibility determination. Notwithstanding this concern, I conclude that the ALJ's adverse credibility determination is supported by substantial evidence.[13] See Frustaglia, 829 F.2d at 195 ("Although more express findings, regarding head pain and credibility, than those given here are preferable, we have examined the entire record and their adequacy is supported by substantial evidence.").

---

Poland's symptoms were attributable to a medically determinable impairment. See Tr. at 159. In contrast, the ALJ did not expressly find that Poland suffered from a medically determinable impairment which reasonably could be expected to produce pain. Such a finding, however, is implicit in his decision because the ALJ, as directed by the regulations, proceeded to assess the intensity and persistence of Poland's pain.

[13] It should be noted that the Appeals Council directed the ALJ, on remand, to evaluate further Poland's subjective complaints and explain his decision. See Tr. at 117. The Appeals Council's order was concerned not with the merits of the credibility determination, but with the process the ALJ used to arrive at this determination. That is, the Appeals Council expected the ALJ to provide a more complete explanation for his credibility determination. None was forthcoming. The portion of the ALJ's decision which addresses Poland's complaints of pain is exactly the same in both the ALJ's 1997 and 1998 decisions. Compare Tr. at 103 with id. at 19.

-23-

The medical evidence in the record supports the ALJ's determination that Poland's pain did not limit his functional capacity beyond that already assessed. As the ALJ noted, the medical evidence indicated some impingement of the thecal sac, see Tr. 178, but it disclosed no sign of nerve root compression, see Tr. 181. Moreover, both Dr. Salerni and Dr. Shea observed that Poland moved without limitation and retained normal range of motion in his lumbar and cervical regions. See Tr. at 180, 190, 191. Dr. Shea also found no evidence of weakness or atrophy in Poland's upper extremities and no evidence of spasms. See id. at 191.

In addition, there is evidence to support the ALJ's conclusion that Poland's sporadic record of medical treatment was inconsistent with his claim of disabling pain.[14] See Irlanda

_____

[14] Indeed, at the outset of the May 1997 hearing, the ALJ expressed his concern with the lack of current medical evidence in the record. See Tr. at 28. Poland's attorney assured the ALJ that he would address the ALJ's concern during the hearing. See id. at 29. Later in the hearing, Poland's attorney asked him why he had opted for chiropractic treatment rather than medical treatment. Poland responded that he stopped seeking medical treatment because "the only thing [medical doctors] can do for me is either operate on me or give me pain pills and a chiropractor is doing more work than taking the chance of going and having the operation. I mean, I go there, they me [sic] shock treatments and they work on my back and if I take it easy and don't pull it all out, I mean, I'm getting by all right." Id. at 37.

Aside from an update, dated March 17, 1998, from Dr. Bell, see id. at 212, no new medical evidence was added to the record

-24-

<u>Ortiz</u>, 955 F.2d at 769 (holding that gaps in the medical evidence constitute "evidence" and that such gaps conflict with claims of "unrelenting pain"); <u>see also</u> <u>Perez Torres v. Secretary of Health and Human Servs.</u>, 890 F.2d 1251, 1255 (1ˢᵗ Cir. 1989)(per curiam) ("The claimant sought no regular treatment for his two allegedly painful conditions, and he submitted no medical evidence of treatment for his back condition. 20 C.F.R. § 404.1513. On this record the ALJ was entitled to discount the severity of the pain complaints . . ."). After his accident, Poland initially was treated by his family doctor who told him he could continue to work. <u>See</u> <u>Tr.</u> at 58. He saw two other chiropractors before he began working with Dr. Bell. Poland first consulted Dr. Salerni sometime in 1996,[15] but only saw him two or three times and received no treatment. <u>See</u> <u>id.</u> at 143. Dr. Bell began to treat Poland in March or April of 1996. <u>See</u> <u>id.</u> According to the disability report he submitted in October 1996, Poland saw Dr. Bell twice a week. <u>See</u> <u>id.</u> As of the May 1998 hearing, Poland went for treatments with Dr. Bell once every two weeks. <u>See</u> <u>id.</u>

at the time of the second hearing in May 1998.

[15] The exact date is not clear from the record. On one report, Poland stated that he first saw Dr. Salerni in either May or June of 1996. <u>See</u> <u>Tr.</u> at 143. The first report from Dr. Salerni, however, is dated January 8, 1996. <u>See</u> <u>id.</u> at 179.

at 54. As far back as January 1996, Dr. Salerni opined that although Poland had been helped by conservative treatment, he had plateaued. The chance that Poland would improve with conservative treatment was low. In contrast, a surgical option offered a 90% chance of allowing Poland to improve. See id. at 180.

Furthermore, the record indicates that Poland took only nonprescription medications to deal with his pain. Poland relied upon Advil, Tylenol, Bengay, see id. at 168, and aspirin, see id. at 55-56, to alleviate his pain.[16] Even though Poland complained of problems sleeping due to his pain, he never took mediation to help him sleep. See id. at 150. The absence of the need to use, or the actual use of, stronger pain medications is inconsistent with the severity of the pain Poland alleged. See Albors v. Secretary of Health and Human Servs., 817 F.2d 146, 147 (1st Cir. 1986) (per curiam) ("[The medical evidence], together with the fact that claimant apparently takes nothing stronger than aspirin, supports the ALJ's rejection of claimant's assertions of disabling pain."); Boisvert v. Callahan, 997 F. Supp. 183, 186

---

[16] In his October 21, 1996 report filed with the Disability Determination Service, Poland indicated that he took Livatrate and Azeo-panger as medications for his condition, but he did not identify the purpose of those medications. See Tr. at 152.

(D. Mass. 1998) ("[The ALJ] found that the plaintiff could not reasonably suffer the degree of pain that she alleged without seeking more active treatment or taking pain medication stronger than Tylenol.").

Similarly, the ALJ inferred from Poland's decision not to undergo surgery that his pain was not as severe as Poland claimed. See Tr. at 19. Poland argues that the ALJ's adverse credibility determination based upon his decision not to undergo surgery violated 20 C.F.R. § 1530. This regulation requires that in order for a claimant to receive benefits, he must follow any treatment prescribed by his physician if the treatment would restore his ability to work. 20 C.F.R. § 1530(a) (1999). If the ALJ had denied Poland benefits on this basis, then he would be required to consider Poland's reasons for failing to follow prescribed treatment. See id. § 404.1530(b),(c). The ALJ, however, did not use Poland's rejection of surgical treatment as a dispositive basis for denying him benefits. Rather, the ALJ used it as an additional indication that Poland's conduct was inconsistent with the severity of the pain he alleged. That is, the ALJ made a permissible inference from the evidence before him. See Irlanda Ortiz, 955 F.2d at 769 ("The Secretary then drew the inference that claimant would have secured more

treatment had his pain been as intense as alleged.  As we stated, the resolution of conflicts in the evidence and the drawing of conclusions from such evidence are for the Secretary.  We accordingly accept the Secretary's determination relating to claimant's exertional impairments.") (internal citation omitted).

There also is substantial evidence in the record to support the ALJ's determination that Poland's daily activities were inconsistent with the degree of pain he alleged.  See Roe v. Chater, 92 F.3d 672, 677 (8th Cir. 1996) ("More telling than a chronicle of [the claimant's] various ailments are his actual activities, which are incongruous with his contention that he cannot work.").  In support of this conclusion, the ALJ noted that Poland continued to perform the maintenance on his automobiles.  Admittedly, the ALJ should have discussed more fully and precisely the evidence regarding Poland's daily activities.  The ALJ acknowledged, however, Poland's testimony that his daily activities were restricted [17] and that when he did

_____

[17]  At the May 1998 hearing, the ALJ did make an effort to develop further the record regarding Poland's daily activities. The ALJ asked Poland questions about how he spent his time, what he did around the house, and who helped him with the work.  See Tr. at 59-60.

Specific restrictions on Poland's daily activities, which were brought out during Poland's testimony at both hearings but

perform chores he had to do them at his own pace.  Although far from exemplary, this was sufficient.

The ALJ's personal observation of Poland reinforced his conclusion that Poland's daily activities were inconsistent with the degree of pain Poland alleged.  In particular, the ALJ observed that Poland had callouses on his hands.  From the ALJ's perspective, such callouses were inconsistent with complaints of disabling pain.  Poland argues that the ALJ's comments about his

---

which the ALJ did not expressly mention, included 1) performing a more limited range of household tasks, 2) working at a slower pace, and 3) needing to lie or sit down after doing any housework. Poland also testified that his sons helped him with his chores.  See id. at 59.  A separate report submitted by Poland indicated that his daughter did the food shopping and helped with meal preparation.  See id. at 150.

The ALJ also failed to mention entirely a statement by Poland's wife regarding the changes in his energy and activity level after the accident.  See id. at 173-75.  This statement is consistent with Poland's own descriptions of his activities and sleep patterns.  It does not, however, add any new evidence or insights.  Moreover, the ALJ is not required to refer one-by-one to each piece of evidence in the record.  See Rodriquez v. Secretary of Health and Human Servs., No. 90-1039, 1990 WL 152336, at *1 (1st Cir. Sept. 11, 1990)(per curiam)("An ALJ is not required to expressly refer to each document in the record, piece-by-piece.  He or she may summarize the medical findings reported there.").

Also in the record, however, were various reports, prepared by Poland, which describe his daily activities.  In these reports, Poland stated that he 1) was able to drive, at least limited distances, on his own; 2) needed no help with his personal hygiene; and 3) went hunting and fishing, although for shorter periods than before his injury.  See Tr. at 145, 150, 151.

calhouses constituted an impermissible, independent medical judgment by the ALJ. To understand Poland's argument, it is necessary to understand what transpired at the May 1997 hearing.

> ALJ: Look at your hands. Turn them over. Callouses. Definitely look like they've been working. Is that consistent with your claim for benefits because you can't work?
>
> POLAND: No. I, I do stuff around the house and stuff. I mean, there's stuff that's got to be done.
>
> ALJ: To the extent that you get those kind of callouses?
>
> POLAND: Yeah. I've had them for 20 years. I mean, they don't –
>
> ALJ: Callouses don't last for 20 years and I've had many a case where the doctor will testify. Twenty days after you stop working your hands clear up.
>
> POLAND: Well, I, I do work on –
>
> ALJ: Do you want to comment on that?

Tr. at 29. Thereafter, the ALJ gave Poland an opportunity to describe the type of work he currently was doing around his house.

I cannot accept Poland's characterization of the ALJ's reference to the time it takes for callouses to heal as an "unwarranted independent medical judgment, based upon testimony outside of the record of this case, see Rousey v. Heckler, 771

-30-

F.2d 1065, 1069 (7th Cir. 1985), . . ." Mem. in Supp. of Mot. for Order Reversing the Decision of the Comm'r at 18 (Doc. no. 7) (emphasis in original). First, Rousey v. Heckler is distinguishable. In that case, the ALJ made his own medical determination that if the claimant stopped smoking, she would be able to return to work. The problem was that the ALJ's determination was not based upon any medical evidence in the record. See Rousey v. Heckler, 771 F.2d 1065, 1069 (7th Cir. 1985) (noting that none of the physicians submitting medical evidence stated that the claimant "would be restored to a non-severe condition if she quit smoking"). In contrast, the ALJ in the present case was not making an independent medical judgment about Poland's condition; for example, he did not conclude that Poland would be restored to a "non-severe condition" if he gave up repairing his automobiles. Rather, the ALJ's remarks about Poland's callouses are analogous to an ALJ's observations of how a claimant moves or appears at the hearing. In both cases, it is permissible for the ALJ to factor his observations of the claimant's physical condition into his credibility determination; that is, to assess whether the ALJ's personal observations of the claimant are consistent with his subjective complaints of pain. See Ortiz v. Secretary of Health and Human Servs., 890 F.2d 520,

523 (1ˢᵗ Cir. 1989)(per curiam)("[T]he ALJ was justified in deeming [the claimant's] complaints not credible to the degree of severity alleged. . . . . [For example,] the ALJ personally observed the claimant at the hearing and noted no 'signs of distress or pain' and no 'difficulty sitting, standing or walking.' We pay 'particular attention' to an ALJ's evaluation of complaints of pain in light of their 'subjective nature.'") (footnote omitted).

C. **ALJ' Determination of Poland's RFC**

A claimant's residual functional capacity ("RFC") represents what the claimant is able to do despite his limitations. See 20 C.F.R. § 404.1545(a) (1999) ("[A RFC assessment] is not a decision on whether [a claimant is] disabled, but is used as the basis for determining the particular types of work [a claimant] may able to do despite [his] impairment(s).").  The ALJ is responsible for determining a claimant's RFC. See 20 C.F.R. § 404.1546 (1999).

To arrive at this determination, the ALJ is required to perform a "function-by-function" assessment of the claimant's ability to do work-related activities. See SSR 96-8p, 1996 WL 374184, at *3; see also Ferraris v. Heckler, 728 F.2d 582, 586-87 (2d Cir. 1984).  Moreover, the ALJ is required to specify the

-32-

evidentiary basis of his RFC determination. See White v. Secretary of Health and Human Servs., 910 F.2d 64, 65 (2d Cir. 1990) (noting that failure to specify basis for RFC conclusion is sufficient reason to vacate decision of Commissioner); SSR 96-8p, 1996 WL 374184, at *7. To comply with both of these requirements, the ALJ must "consider objective medical facts, diagnoses and medical opinions based on such facts, and subjective evidence of pain or disability testified to by the claimant and others." Ferraris, 728 F.2d at 585; see also 20 C.F.R. § 404.1545(a) (RFC must be based upon all relevant evidence). The ALJ, however, is a lay person. As a result, the ALJ is not qualified to "assess residual functional capacity based on a bare medical record." Gordils v. Secretary of Health and Human Servs., 921 F.2d 327, 329 (1st Cir. 1990)(per curiam); see also Manso-Pizarro v. Secretary of Health and Human Servs., 76 F.3d 15, 17 (1st Cir. 1996)(per curiam)(observing that record contained no analysis of functional capacity by physician or other expert); Berrios Lopez, 951 F.2d at 430. This means that if the medical evidence only diagnoses the claimant's impairments -- but does not relate them to an extertional level, e.g., light work -- then the ALJ may not make the connection himself. Vital v. Shalala, Civ. A. No. 92-12695-MLW, 1994 WL 548051, at *7 (D.

Mass. Aug. 11, 1994).

In his decision issued after the May 1997 hearing, the ALJ concluded that Poland had an RFC enabling him to perform the full range of sedentary work. See Tr. at 103. The ALJ provided only a conclusory explanation for his determination:

> After reviewing all of the medical evidence and testimony in this case, I find that the claimant's disc herniation at C6-7 and disc degeneration at L5-S1 restrict his ability to perform basic work functions. The claimant could not be expected to lift and carry anything in excess of 10 pounds, or stand and walk for prolong periods of time.

Id. at 102. The Appeals Council found the ALJ's RFC assessment inadequate and remanded the case in order for him to perform a "function-by-function assessment of the claimant's ability to do work-related physical and mental activities or sufficient rationale with specific references to evidence of record in support of the assessed limitations." Id. at 116.

The ALJ's decision issued after the May 1998 hearing contains such a function-by-function assessment of Poland's ability to do work-related physical activities.

> After reviewing all of the medical evidence and testimony in this case, I find that the claimant's disc herniation at C6-7 and disc degeneration at L5-S1 restrict his ability to perform basic work functions. He is ale [sic] to lift and carry 10 pounds occasionally and 5 pounds frequently, must have a sit/stand and position change option, but is not able to climb or crouch, and is limited to only occasional

-34-

> stooping, kneeling, and crawling, and can do no more
> than limited reaching, pushing and pulling.  Mr. Poland
> is able to perform the extertional requirements of
> light work as long as lifting and carrying are limited
> to the above-mentioned 10 pounds occasionally and 5
> pounds frequently.  He is able to stand and walk for up
> to six hours in an eight-hour work day as long as he
> has a sit/stand option during the work day.

Id. at 18.  In light of this more complete RFC assessment, the

ALJ concluded that Poland's functional limitations still

permitted him to perform a limited range of light[18] and sedentary

work.  See id. at 19.

The crux of Poland's complaint with the ALJ's RFC

determination is that the ALJ did not take Dr. Bell's assessment

of Poland's functional limitations into account.  There is no

merit to this claimed error.  As I discussed above, the ALJ was

not required to credit Dr. Bell's assessment of Poland.

Moreover, the ALJ adequately explained why he did not credit Dr.

---

[18]  "Light work involves lifting no more than 20 pounds at a
time with frequent lifting or carrying of objects weighing up to
10 pounds.  Even though the weight lifted may be very little, a
job is in this category when it requires a good deal of walking
or standing, or when it involves sitting most of the time with
some pushing and pulling of arm or leg controls.  To be
considered capable of performing a full or wide range of light
work, you must have the ability to do substantially all of these
activities.  If someone can do light work, we determine that he
or she can also do sedentary work, unless there are additional
limiting factors such as loss of fine dexterity or inability to
sit for long periods of time."
20 C.F.R. § 1567(b) (1999).

-35-

Bell's assessment. The ALJ's RFC is supported by substantial evidence in the record and therefore must be affirmed.

The ALJ's RFC assessment was in line with that prepared by the state's doctors. The state determined that Poland could occasionally lift 20 pounds and frequently lift 10 pounds. It also found that Poland could stand and/or walk, with normal breaks, for 6 hours in an 8 hour workday. He also was deemed able to sit, with normal breaks, for 6 hours in an 8 hour workday. See id. at 155. The state's RFC assessment also concluded that Poland: 1) was able to push and pull without limit, except to the extent of the limits on his ability to lift and/or carry, see id.; 2) had no manipulative, visual, communicative, or environmental limitations, see id. at 157-58; and 3) could occasionally climb, balance, stoop, kneel, crouch, and crawl, see id. at 156. The assessment's overall conclusion was that Poland was capable of performing light work. See id. at 161.

The ALJ was not entitled to rely upon Dr. Salerni's evaluation of Poland as a basis for his RFC assessment because Dr. Salerni's report diagnoses Poland, but does not relates these diagnoses to a specific extertional level. That is, Dr. Salerni's report only provided the ALJ with raw medical evidence.

The only other RFC assessment in the record was that of Dr. Bell. The ALJ correctly exercised his prerogative not to credit it.

## D.  Hypothetical Posed to VE

To be entitled to credit the testimony of a vocational expert ("VE"), the ALJ must pose to the VE a hypothetical which accurately reflects the claimant's functional limitations.  See Rose, 34 F.3d at 19 (holding that ALJ could not rely on vocational expert's response to find claimant disabled because hypothetical impermissibly omitted significant functional limitation claimant had); see also Roe, 92 F.3d at 676 ("The point of the hypothetical question is to clearly present to the VE a set of limitations that mirror those of the claimant."). That is, the ALJ may credit the VE's response only if there is "substantial evidence in the record to support the description of the claimant's impairments given in the ALJ's hypothetical to the vocational expert."  Berrios Lopez, 951 F.2d at 429; see also Arocho, 670 F.2d at 375.

In accordance with the Appeals Council's opinion, the ALJ, at the May 1998 hearing, called a VE to testify to 1) Poland's ability to perform his past relevant work and 2) whether there were jobs in the national economy which Poland was capable of performing.  At the hearing, the ALJ and the VE engaged in the

following colloquy:

ALJ: Okay.  Assume that the, the claimant is a younger worker, specifically on the alleged onset date he was about 40 years of age with 12 years of education who has the past work, who has the work experience already identified in the file. . . . Assume from an extertional point of view he can perform sedentary work.  Let me define that.  He could sit for up to six hours a day, stand for up to two hours a day and in an eight hour day lift occasionally, that is up to one-third of the day, 10 lbs., but frequently 5 lbs., but that ability to do sedentary work is reduced, that vocational base is reduced to less than a full range of sedentary work because he must have a sit/stand option and a position change option.  He, he – there should be no climbing or crouching involved in the work and only occasional stooping, kneeling and crawling with limited, no more than 50 percent of the time working, reaching, pushing and pulling.  Considering those limitations and vocational factors, can the claimant perform any of his past relevant work?

VE: No.

ALJ: Considering the vocational factors and the functional limitations, are there any skilled or semiskilled jobs in the national economy to which such an individual would have transferable skills?

VE: No.

ALJ: Considering the vocational factors and the functional limitations, are there any unskilled jobs in the national economy that such an individual can perform?

VE: May I ask you a question about –

ALJ: Yes.

VE: You gave me a less than ful full range of sedentary with the opportunity to change position.  I'd have to consider some light jobs for opportunity to change position.

ALJ: Okay.  As long as he as that at-will positional change, sit/stand option.  I understand that some jobs, a light with no lifting, only because they involve standing for more than two hours.

VE: That's right

ALJ: So, the, the claimant could do light work as long as the lifting was only say 10 lbs. occasional, 5 lbs.

-38-

> frequently, but he can, he can stand and sit, keeping,
> changing positions, he can stand for half an hour, sit
> for half an hour.  Stand for 45 minutes, sit for an
> hour.  Stand for 20 minutes, sit for 20 minutes.  He
> can, he, he has to have that option to change
> positions, sit/stand.  I don't know if that answers
> your question.
>
> VE:  Yes, it does.
> ALJ: Okay.
> VE:  Thank you.
> ALJ: Go ahead. The question is considering the vocational
>      factors and the functional limitations, are there any
>      unskilled jobs in the national economy that he could
>      perform.
> VE:  Yes.

Tr. at 68-70 (emphasis added).  The ALJ and the VE then discussed

the type and number of jobs in the national economy which Poland

would be able to perform given his functional and vocational

limitations.  I conclude that because the hypothetical the ALJ

posed to the VE included functional limitations which both

accurately reflected Poland's impairments and were supported by

substantial evidence, the ALJ was entitled to rely upon the VE's

response in arriving at the determination that Poland was not

disabled.

There is no merit to Poland's argument that the hypothetical

did not accurately reflect his functional limitations because it

did not include those limitations identified in Dr. Bell's RFC

assessment.  The ALJ only must include those functional

limitations that he concludes are substantially supported by the

record as a whole.  See Roe, 92 F.3d at 675.  If the ALJ chooses not to include functional limitations identified by testimony from other sources, for example, lay testimony regarding the claimant's symptoms, he must state his reasons for rejecting that testimony.  See Nguyen, 100 F.3d at 1467.  Because the ALJ found that Dr. Bell's assessment was not supported by substantial evidence in the record, he was not required to include the functional limitations identified by Dr. Bell in the hypothetical.  Moreover, the functional limitations the ALJ did include in the hypothetical were supported by substantial evidence.[19]  As discussed above, these limitations were consistent with – and in several cases, were more favorable than – the functional limitations identified in the state's RFC assessment of Poland.

Poland also contends that the ALJ mishandled and misconstrued the hypothetical which his attorney posed to the VE.

_____

[19]  In his hypothetical, the ALJ seemed to conclude that Poland's RFC enabled him to perform less than a full range of sedentary work.  In his final opinion, the ALJ concluded that Poland's RFC enabled him to perform a limited range of light and sedentary work.  This seeming inconsistency is not problematic. If the VE believed that jobs existed in the national economy which could be performed by a person with the set of limitations identified in the hypothetical, then a person with a set of limitations less restrictive than that identified in the hypothetical – i.e., the set of limitations identified in the ALJ's final opinion - could perform those same jobs.

Poland's attorney wanted to add to the ALJ's hypothetical that Poland would need three additional daily breaks - the timing of which would be left to Poland's discretion - for a total of about one hour of additional break time during the regular work day. See Tr. at 75, 76.  The ALJ misunderstood what Poland's attorney was asking the VE; he thought Poland's attorney was asking the VE to consider whether there were any jobs in the national economy which would allow Poland to take three additional breaks totaling three additional hours of break time each day.  See id. at 75. Poland's attorney eventually posed the following hypothetical to the VE:

> ATTY:     And, and these, these other breaks as, as opposed to the sit/stand option, would have to be at his discretion. They can't be factored in on, on a programmed basis.  In other words, when he needs to do it, he - at-will breaks totaling an additional hour during the day.
>
> ALJ:      Okay.  Does that change your testimony in any way, Ms. Dotter?
>
> VE:       Hypothetically in general, that would be precluded.  My predicament is that it seems like that's what's going on.  So, hypothetically in general without any type of special accommodation it wouldn't be tolerated.
>
> ALJ:      It would not?
>
> VE:       Would not.
>
> ALJ:      Okay.

Id. at 76.

   In his written decision, the ALJ concluded that he could not credit the hypothetical posed by Poland's attorney.   See id. at

-41-

18. The ALJ reasoned that the medical evidence regarding Poland's spinal lesion did not justify restricting Poland's functioning so severely. He concluded that "[n]either Dr. Bell or [sic] Dr. Salerni has advised that the claimant requires up to three additional breaks per work day lasting up to three hours." Id. (emphasis added).

I agree that the ALJ's handling of Poland's alternative hypothetical was far from exemplary. Both at the hearing and in his final decision, the ALJ confused and mischaracterized Poland's modification of the hypothetical. Notwithstanding this confusion, remand is not required in this case. The basis for suggesting Poland would need three additional breaks was Dr. Bell's assessment of Poland's functional limitations. The ALJ properly explained why he did not credit Dr. Bell's assessment. As a result, the ALJ, even if had properly understood Poland's amendment to the hypothetical, still would not have credited it. Because there was no other evidence in the record to support Poland's amendment to the ALJ's hypothetical, and there was substantial evidence to support the hypothetical the ALJ posed, no error arose from the ALJ's confusion. See Perez Torres, 890 F.2d at 1255 ("Although the ALJ misread the record in stating that the claimant has never alleged a mental condition – the

-42-

claimant alleged an emotional condition in August 1986, and again in his hearing request in February 1987, – we have examined the entire record and find the error harmless.").

## IV. <u>CONCLUSION</u>

For the forgoing reasons, I conclude that there was substantial evidence to support the Commissioner's denial of Poland's application for disability benefits. Accordingly, I affirm the decision of the Commissioner and deny Poland's motion to reverse the Commissioner's decision.[20]

SO ORDERED.

                                       _____

                                       Paul Barbadoro
                                       Chief Judge

December 22, 1999

cc:  Raymond J. Kelly, Esq.
      David Broderick, Esq.

---

[20] Because I deny Poland's motion, I decline to exercise my right under local rule 5.2 to strike his nonconforming memorandum submitted in support of his motion to reverse the Commissioner's decision. <u>See</u> D.N.H.R. 5.2 ("The clerk's office shall file nonconforming filings, subject to the court striking the filing on its own initiative or on motion by a party."). Under local rule 7.1(a)(3), memorandum in support of dispositive motions are not to exceed 25 pages; under local rule 5.1(a) all filings are to have margins of no less than one inch and are to use a font size no smaller than ten characters per inch. I earlier denied Mr. Poland's motion to file a memorandum in excess of 25 pages. <u>See</u> Pl.'s Mot. for Permission to File Mem. in Excess of 25 Pages (Doc. no. 5). The memorandum Poland eventually submitted was 25 pages but it did not observe the one inch margin rule and portions of it also appear to violate the font size rule. Had Poland's claimed errors been meritorious, I would have exercised my right to strike this memorandum.